UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CITY OF DEARBORN HEIGHTS ACT | * | |
| 345 POLICE & FIRE RETIREMENT SYSTEM, | * | |
| Individually and on Behalf of All Others | * | |
| Similarly Situated, | * | |
| | * | Civil Action No. 1:08-11889-JLT |
| Plaintiff, | * | |
| v. | * | |
| | * | |
| WATERS CORPORATION, DOUGLAS A. | * | |
| BERTHIAUME and JOHN A. ORNELL, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM

March 25, 2010

TAURO, J.

I.      Introduction

Lead Plaintiff Inter-Local Pension Fund GCC/IBT ("Inter-Local") brings this securities fraud class action against Defendant Waters Corporation ("Waters Corp." or the "Company") and two of its executives, Douglas A. Berthiaume and John A. Ornell (the "Individual Defendants"). The two-count Amended Class Action Complaint (the "Complaint") alleges violations of (1) Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"),[1] and Securities and Exchange Commission ("SEC") Rule 10b-5[2] against all Defendants; and (2) Section 20(a) of the Exchange Act[3] against the Individual Defendants.

---

[1] 15 U.S.C.A. § 78j(b) (West 2009).

[2] 17 C.F.R. § 240.10b-5 (2009).

[3] Section 78t.

Presently at issue is Defendants' <u>Motion to Dismiss</u> [#18] both counts.  For the following

reasons, Defendants' Motion is ALLOWED.

II.    <u>Background</u>[4]

This action was filed on November 12, 2008 on behalf of all individuals and entities who

purchased the common stock of Waters Corp. between July 24, 2007 and January 22, 2008 (the

"Class Period").  The Complaint alleges that Defendants "disseminated or approved . . . materially

false and misleading statements"[5] and "failed to disclose material facts"[6] about Waters Corp.'s

"slowdown in sales in the Japanese market"[7] and "the Company's effective tax rate for the fourth

quarter"[8] which caused Inter-Local to suffer significant losses and damages.  The following

background facts are taken from the Complaint and publicly filed documents.[9]

A.    <u>Waters Corp.</u>

Waters Corp. designs, manufactures, sells, and services high performance liquid

---

[4]For the purposes of this motion, this court accepts all factual allegations in the Complaint as true.  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (U.S. 2007) ("faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true").

[5]Am. Compl. ¶ 51.

[6]<u>Id.</u>

[7]<u>Id.</u> ¶ 25.

[8]<u>Id.</u> ¶ 31.

[9]<u>See</u> <u>In re First Marblehead Corp. Secs. Litig.</u>, 639 F. Supp. 2d 145, 148 (D. Mass. 2009) (citing <u>In re Colonial Mortgage Bankers Corp.</u>, 324 F.3d 12, 19 (1st Cir. 2003) ("[M]atters of public record are fair game in adjudicating Rule 12(b)(6) motions, and a court's reference to such matters does not convert a motion to dismiss into a motion for summary judgment.")).

chromatography, ultra performance liquid chromatography, and mass spectrometry instrument systems and support products.  The Company operates primarily in the United States, Europe, Japan and Asia.

      B.    <u>Alleged Materially False and Misleading Statements</u>

The Complaint avers that Defendants issued materially false and misleading statements relating to the Company's present and future financial prospects in July and October 2007.

First, Inter-Local alleges that the Company, which regularly provided detail to investors about Waters Corp.'s sales in the Japanese market, withheld information concerning a decline in sales in Japan and made several related misrepresentations.  Japan is an important market for Waters Corp.'s products and services, representing over 10% of the Company's net sales in 2006. In March 2007, Japanese regulatory authorities issued amendments to the prevailing water testing regulations, reducing the amount of required testing.  As a result of those regulatory changes, demand for the Company's consumables and instruments declined.  The regulatory amendments also negatively impacted Waters Corp.'s growth prospects in the Japanese market.

Second, Inter-Local alleges that the Company misled investors about its fourth quarter 2007 tax rate, which was higher than predicted.

      1.    <u>The July Statements</u>

Waters Corp. issued a press release (the "Second Quarter Press Release") concerning its second quarter results on July 24, 2007 containing comments from Defendant Berthiaume, the Chairman, Chief Executive Officer and President of Waters Corp.  The press release included the following statement, attributed to Mr. Berthiaume:

    The generally broad-based growth that we experienced in the first quarter

accelerated with continued rapid uptake of our new products and strengthening demand from life science customers, including our large pharmaceutical accounts. Our first half results are very encouraging and we are optimistic that our new system offerings will continue to stimulate demand going forward.

Waters Corp. also held a conference call (the "Second Quarter Conference Call") following the issuance of the Second Quarter Press Release with investors and analysts to discuss the Company's earnings and operations.  The Complaint highlights comments made on the call by Defendant Ornell, then employed as the Company's Chief Financial Officer, Principal Accounting Officer, and Vice President of Finance & Administration:

> Now we would like to turn to our updated outlook for 2007. Our business prospects continue to look very positive with most of our end markets and geographies enjoying strong customer demand. On our April call, we said that we thought our full year organic sales growth would be 9%, and that favorable currency effects and acquisitions would bring overall sales growth to 12%. Given our strong organic sales results to date, the success of our recent acquisitions and a slightly more favorable currency environment, we now believe that we can achieve a 14% sales growth this year. For the full year currency of today's levels should provide about 2 points of this sales growth and acquisitions should be around 2 points of growth as well. For the full year 2007, we believe margins will remain under pressure from foreign currency translation effects and the accelerated placement of newer instrument systems with somewhat lower gross margins. At this time we believe our gross margins will continue to show improvement as the year progresses, and that by the fourth quarter we will likely show higher margins versus prior year.

> For the full year gross margins are likely to be about 50 basis points lower than 2006 overall. Operating expenses are expected to grow at about 10% in 2007. At the operating margin line we expect to see an improvement in 2007 of around 75 basis points versus 2006. Interest expense is expected to be around $27 million for the year, and we expect the effective tax rate to remain around 15% for the full year. And the net impact of our new share repurchase program is likely to reduce outstanding share count to around 102 million fully diluted average shares for 2007.

> **Rolling all of this together, we currently expect non-GAAP earnings of $2.80 for fully diluted share with the normal tolerance of $0.01 to $0.02 per quarter. This represents a 22% increase over earnings per share of $2.29 last year.**

4

For Q3, we estimate sales growth of 14%, comprised of 10% organic growth, two points of M&A impact and 2 points of currency impact. At this sales level we expect non-GAAP earnings per fully diluted share of $0.58 with the normal tolerance of $0.01 to $0.02 for the quarter and before any unusual charges. This represents a 16% increase over earnings per share of $0.50 in the second quarter 2006.[10]

Inter-Local claims that the statement by Berthiaume in the Second Quarter Press Release and the above-bolded statement by Ornell were "materially false and misleading when issued because they failed to disclose and misrepresented that the Company was then experiencing a slowdown in sales in the Japanese market as a result of amendments to [the Japanese water testing] regulations," a change which took effect in March 2007.[11]

    2.    <u>The October Statements</u>

On October 23, 2007, Waters Corp. issued a press release (the "Third Quarter Press Release") regarding its third quarter earnings.  Inter-Local alleges that the following statement from the press release, made by Mr. Berthiaume, is misleading: "The broad-based growth that we experienced in the first half of 2007 continued through the third quarter with the ongoing success of our major programs and a generally favorable spending environment."[12]

Waters Corp. also held a conference call (the "Third Quarter Conference Call") to discuss the Company's third quarter earnings and operations with analysts and investors.  Inter-Local points to several comments on the Third Quarter Conference Call which it claims are materially false and misleading.

---

[10]<u>Id.</u> ¶ 24 (emphasis in original).

[11]<u>Id.</u> ¶ 25.

[12]<u>Id.</u> ¶ 26.

First, when discussing the Company's Japanese sales, Mr. Berthiaume stated that:

> Outside the United States, the only really major market where we saw some softness in demand was in Japan. I think this weakness appeared related to general economic conditions and we are confident that our competitive position in Japan remains strong and that our sales there are likely to pick up as general spending conditions improve.[13]

Inter-Local characterizes this statement as a "half-truth," asserting that, in addition to poor "general economic conditions," "the Company had also experienced a decline in demand for its products due to a change in Japanese testing regulations."[14]  For that reason, Inter-Local argues "[w]hen Defendants chose to speak about the Company's results for the Japanese market, they were required to speak fully and accurately about sales in that region, which they did not do."[15]

Second, Inter-Local complains of another statement made by Mr. Berthiaume regarding the Company's outlook for the fourth quarter, as well as the 2007 year-end results:

> Before passing you on to John [Ornell] to review the financials, I'd like to say that 2007 has shaped up as a very successful year for Waters from just about every perspective. Our products are performing well in the marketplace and appear to be driving gains in share. And our financial results, relying principally on organic sales growth, continue to set the pace for the industry."[16]

Finally, Inter-Local complains of several statements made by the Individual Defendants regarding the Company's tax rate on the Third Quarter Conference Call.  For his part, Mr. Ornell stated:

---

[13] Id. ¶ 27.

[14] Id. ¶ 28.

[15] Id.

[16] Id. ¶ 29.

Now I would like to turn to our updated outlook for 2007. Our business prospects remain strong with our end markets and geographies enjoying strong customer demand. Our expectations for the fourth quarter are essentially unchanged from our July guidance. We expect sales growth of 12% for the fourth quarter. Within the fourth quarter, we expect a combination of improved gross margins and operating expense leverage to provide for operating margin of around 30%. Net interest expense is expected to be around $6.5 million for the quarter, and **we expect our effective tax rate in the fourth quarter to be 15.9%.** And the fully diluted outstanding shares are likely to be comparable to Q3 balances.

**Rolling all of this together, we currently expect non-GAAP earnings of $1.06 per fully diluted share for the quarter with normal tolerance of $0.01 to $0.02 for the quarter. For full-year 2007 then, we expect non-GAAP earnings of $2.84 per fully diluted share with the normal tolerance of $0.01 to $0.02 for the fourth quarter. This represents 24% earnings growth over last year.**[17]

Both Individual Defendants then fielded a question from a caller, Quintin Lai, regarding the fourth quarter tax rate:

QUINTIN LAI: Hi. Thanks for taking the follow-up. With respect to tax rate, you said that there was a true up to get it to 16.2%, but then in the fourth quarter now you're saying 15.9%. So I guess why isn't fourth quarter just at 16.2%, and then kind of going forward, John, do you think 16% is kind of a good rate?

DOUGLAS BERTHIAUME: What an excellent question because that's a question that the CEO has asked three times in the wrap-up of this quarter.

JOHN ORNELL: Welcome to the world of FIN 48 unfortunately. Within the quarter, we had a couple of adjustments associated with estimates of liabilities for the U.S. return and the mass tax return from '06, the combination of which resulted in the fact that we had to true up those estimates all within the third quarter. It doesn't get smoothed across the entire year's rate. So those couple of amounts when you include them in kind of the run rate pro forma tax rate comes to 16.2% for the full year, but on a run rate basis when you exclude those couple of items, you're back down to 15.9%, which would be kind of the starting point for looking at what the tax rate might be going forward. So again it's taking that full impact all within the third quarter and not smoothing it across the full-year rate.

DOUGLAS BERTHIAUME: Quintin, the way I think is the easiest way to understand it is it's almost $1 million of tax provision in the third quarter. It's kind of a one-time item that unfortunately the tax laws require or the accountants require you

[17] Id. ¶ 30 (emphasis in original).

to put that three-year provision all in the third quarter. And then it goes away in the fourth quarter. So it's confusing, but that's the way you're required to do it.[18]

The Complaint avers that the above-listed statements "were materially false and misleading because, based on the Company's expected sales for the fourth quarter, Defendants knew or recklessly disregarded that the Company's effective tax rate for the fourth quarter would be 20.7% and not the 15.9% represented."[19]

According to Inter-Local, the alleged material misstatements and omissions discussed above "had the cause and effect of creating in the market an unrealistically positive assessment of Waters Corp. and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times."[20]

C.    Negative Results Revealed to the Public

On January 22, 2008, Waters Corp. issued a press release (the "Year End Press Release") announcing its fourth quarter and year end results for 2007.  The Year End Press Release contained a statement by Mr. Ornell that despite impressive year end results, Waters Corp.'s "financial results were less than our expectations primarily as a result of a higher than expected tax rate for 2007 and weaker sales in Japan."[21]

Defendants then held a conference call (the "Year End Conference Call") on which

---

[18]Id.

[19]Id. ¶ 31.

[20]Id. ¶ 40.

[21]Id. ¶ 34.

Messrs. Berthiaume[22] and Ornell[23] discussed disappointing fourth quarter results. On the call,

---

[22]Mr. Berthiaume stated, in pertinent part,

"While our fourth quarter results reflect strong operating income performance and allowed us to achieve significant sales in earnings growth for the full year and it was accompanied by very strong cash generation. **However, our earnings per share growth in the fourth quarter did not materialize quite as we had anticipated, as an unexpected increase in our annual tax rate, among other factors, adversely affected our bottom-line performance.** John will walk you through the details and quantify the factors that resulted in this adjustment. Now I'll review for you some of the significant trends that we saw in the fourth quarter and help set the stage for our outlook for 2008.

In the quarter, we principally saw our continuation of the trends that drove our growth through the first nine months of the year. These trends included improved pharmaceutical spending, the continued expansion of our businesses in the developing world, rapid uptake of ACQUITY UPLC and our new MS systems, and very impressive results for the TA Instrument division. Our sales growth was in line with our October outlook, however, foreign currency translation was a larger factor than we expected. **In addition, our sales in Japan were weaker than anticipated due to a combination of a sluggish economic condition and a change in the testing protocols for drinking water analysis in Japan.** In our opinion, however, we have maintained or even marginally expanded our market share position in Japan through this tough period.

Id. ¶ 35 (emphasis in original).

[23]Mr. Ornell stated, in pertinent part,

Sales in the U.S. continued their double digit growth and this quarter were up 12%. **Sales within Europe were a bit slower in the fourth quarter and were up 5% before currency effects. Sales in Japan were softer than expected and were down by 12% in Q4.** However, outside of Japan, Asian sales remained strong and grew by 18%. Turning to the product front, within the Waters division, instrument systems grew by 3% versus a difficult base of comparison. Our service business grew by 7% and chemistry had 20% growth, which was aided by acquisitions and growth of ACQUITY after market column sales. Without acquisitions, our chemistry business grew by 11%. Our TA Instruments division had another strong quarter with sales up 19% versus prior year, resulting from strong new product sales. M&A activity contributed 2% to this result as well.

Now I'd like to comment on non-GAAP margins and expenses, excluding

Mr. Berthiaume admitted that the Company's "sales in Japan were weaker than anticipated due to

a combination of a sluggish economic condition and a change in the testing protocols for drinking

water analysis in Japan."  He explained further that "what happened last year is that the Japanese

government substantially reduced the sampling requirements and as a result we saw a reduction in

our business.  We had a leading share in this marketplace.  And we saw a reduction in both the

consumable side of the business because of the samples, as well as the instruments that were

---

adjustments noted in this morning's press release. Gross margin came in a little lower
than expected at 58.4% this quarter. Versus prior year, margins expanded this quarter
and were up by 40 basis points. Versus our expectations, however, margins were
lower than our October forecast due largely to less favorable manufacturing
variances resulting from lower than anticipated instrument production. SG&A and
R&D expenses grew by 7% this quarter compared to prior year. **Our operational tax
rate this quarter was 20.7%, bringing our full year operational rate to 18%**.
This rate was well above our expectation and is largely the result of a couple of
factors. **First, during the quarter our production levels at our tax favored
Ireland and Singapore manufacturing facilities were lower than expected for
select instrument systems due to shifts in customer demand and inventory
reductions**.

At the same time, production volumes at our U.K., U.S. manufacturing sites were an
aggregate over plan as ACQUITY, Synapt and TA product sales were strong. These
variances in manufacturing volume resulted in additional tax expense of about $2
million. And secondly, at the end of each year, during our closing process we review
our legal entity results and make necessary adjustments to our inter-Company pricing
to comply with our transfer pricing policies. These adjustments are the result of
variances and expected volumes within sales subsidiaries, actual versus estimated
legal entity costs and adjustments to estimated charges for support services, all of
which impacted profitability at many of our 40 legal entities. **Historically, these
year-end adjustments have netted the smaller amounts and were generally offset
by favorable production volumes in Ireland and Singapore. This year, however,
these adjustments resulted in an additional tax expense of about $3 million**.

Id. ¶ 35 (emphasis in original).

required to run it."[24]  He also added that "[s]ales within Europe were a bit slower in the fourth

quarter and were up 5% before currency effects. Sales in Japan were softer than expected and

were down by 12% in Q4."

On the subject of the effective tax rate, Mr. Ornell explained to analysts and investors that

Waters Corp.'s "operational tax rate this quarter was 20.7%, bringing our full year operational

rate to 18%."[25]  He continued, "[t]his rate was well above our expectation and is largely the result

of a couple of factors. First, during the quarter our production levels at our tax favored Ireland

and Singapore manufacturing facilities were lower than expected for select instrument systems

---

[24]Mr. Berthiaume's comments, in full, were as follows:

Well, Japan, specifically on the drinking water applications, Japan had very strong regulations concerning the number of samples and it began, probably in earnest about three years ago. And they continue to expand the analytical requirements and they continue to expand the number of samples that had to be run. So labs had to keep adding capacity, not only in our gear, but in a lot of analytical technologies in order to meet those requirements. **And what happened last year is that the Japanese government substantially reduced the sampling requirements and as a result we saw a reduction in our business. We had a leading share in this marketplace. And we saw a reduction in both the consumable side of the business because of the samples, as well as the instruments that were required to run it**.

With -- I got, I guess, take a little bit of the blame. We probably should have seen this a little earlier. We knew that the slope wasn't going to be as strong forever in these applications, but the down turn came much faster than we anticipated. So the slope in the fourth quarter was a pretty significant one and that's what caught us up by a little bit of a surprise . . .

The most significant affect was the water testing. We saw a little bit of a falloff in the food testing business also. So the regulated applications for food testing and water testing were probably the two most significant factors.

Id. ¶ 35 (emphasis in original).

[25]Id. ¶ 35.

due to shifts in customer demand and inventory reductions . . . Historically, these year-end adjustments have netted the smaller amounts and were generally offset by favorable production volumes in Ireland and Singapore.  This year, however, these adjustments resulted in an additional tax expense of about $3 million."[26]

Inter-Local claims that, as a result of the negative information contained in the Year End Press Release and the Year End Conference Call, the price of Waters Corp. common stock fell $14.65 per share to $58.58 per share, for a total loss of approximately 20%.[27]

D.    Allegations of *Scienter*

In alleging *scienter*, Inter-Local claims that "Defendants were further motivated to engage in this course of conduct in order to allow Defendants Berthiaume and Ornell and other Company insiders to collectively sell 637,500 shares of their personally-held Waters Corp. common stock for gross proceeds in excess of $42 million."[28]

Paragraph 42 of the Complaint contains a list of alleged "insider shares sold during the Class Period," including references to stock sales by Messrs. Berthiaume and Ornell.  On September 11, 2007, four months prior to the disclosure that sparked a decline in the stock price of Waters Corp., Mr. Berthiaume allegedly sold 180,000 shares of the common stock of Waters Corp., or 6.08% of his total holdings, in two separate trades, accruing proceeds of $11,450,302. Mr. Ornell allegedly sold 83.24% of his holdings of common stock on September 12, 2007 and October 26, 2007 during the Class Period, for a total of $5,823,272 in proceeds.

---

[26]Id. ¶ 35.

[27]Id. ¶ 36.

[28]Id. ¶ 42.

The Complaint also avers that seven other alleged "insiders" sold common stock during the seven-month class period: Mark Beaudouin, who allegedly sold approximately 90% of his shares on October 31, 2007; Arthur Caputo, who allegedly sold 36.63% of his shares on four separate occasions in August and September of 2007; William Curry, who allegedly sold 94.46% of his shares on November 1, 2007; Laurie Glimcher, who allegedly sold 37.50% of her shares on November 8, 2007; William Miller, who allegedly sold 27.78% of his shares on December 4, 2007; Elizabeth Rae, who allegedly sold 86.31% of his shares on October 26, 2007; and Thomas Salice, who allegedly sold 5.10% of his shares on October 30, 2007.[29]

## III.   Discussion

### A.   Legal Standard for Motion to Dismiss

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts "must accept as true all well-pleaded facts 'indulging all reasonable inferences'" in the plaintiff's favor.[30]  In addition to the facts alleged in the complaint, courts must also consider documents incorporated into the complaint by reference and matters that are properly the subject of judicial notice.[31] Courts are not required to accept, however, "bald assertions,""unsubstantiated conclusions" and "the like."[32]

Under Rule 12(b)(6), dismissal is appropriate "if the complaint fails to set forth 'factual

---

[29]Id. ¶ 42.

[30]Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009) (quoting Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006)); In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332, 339 (D. Mass. 2009).

[31]Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

[32]Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'"[33] In addition, Rule 9(b), applicable to allegations of fraud or mistake, imposes a higher pleading standard on these claims than the traditional pleading standard set forth in Rule 8(a), requiring dismissal where a plaintiff fails to 'state with particularity the circumstances constituting fraud or mistake.'"[34]

B.      Heightened Pleading Standard Applicable to Allegations of Securities Fraud

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."   "SEC Rule 10b-5 implements § 10(b) by declaring it unlawful: '(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'"   To allege a cause of action for securities fraud under Rule 10b-5 and § 10(b), a complaint must plead the following six elements: "(1) a material misrepresentation or omission; (2) *scienter*, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic  loss; and (6) loss causation."[35]

---

[33]Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (internal citations omitted).

[34]In re First Marblehead Corp. Secs. Litig., 639 F. Supp. 2d at 153.

[35]ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).

The Private Securities Litigation Reform Act ("PSLRA") requires that a securities fraud complaint alleging a material misrepresentation or omission "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[36]  A securities fraud complaint must also specify the "time, place and content" of each allegedly misleading statement or omission.[37]  At this stage in the proceedings, a securities fraud plaintiff is not required to plead evidence.[38]  Rather, to withstand a motion to dismiss, a complaint need only allege "the existence of [allegedly materially misleading] statements and presents a plausible jury question of materiality."[39]

The PSLRA also requires that a securities fraud plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[40]  "The 'required state of mind' for liability under section 10(b) and Rule 10b-5 is *scienter*, which the Supreme Court has defined as 'a mental state embracing intent to deceive, manipulate, or

---

[36]15 U.S.C. § 78u-4(b)(1).

[37]Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002).

[38]See Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 90 (1st Cir. 2008) ("this court has held that 'in determining the adequacy of a complaint . . . we cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence'").

[39]Winters v. Stemberg, 529 F. Supp. 2d 237, 249 (D. Mass. 2008) (quoting Bielski v. Cabletron Sys. (in Re Cabletron Sys.), 311 F.3d 11, 34 (1st Cir. 2002)).

[40]Tellabs, Inc., 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).

defraud.'"[41]   To withstand a motion to dismiss, a securities fraud complaint "must establish that 'defendants consciously intended to defraud, or that they acted with a high degree of recklessness.'"[42]

The phrase "strong inference" is not defined in the PSLRA.  But, the Supreme Court, in Tellabs, Inc. v. Makor Issues & Rights, Ltd., recently advised that "an inference of *scienter* must be more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[43]  On a motion to dismiss, the proper inquiry is "whether <u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of *scienter*, not whether any individual allegation, scrutinized in isolation, meets that standard."[44]

The Tellabs court described the process for determining the sufficiency of allegations in a securities fraud complaint in the following manner:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of *scienter*, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with *scienter* need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the "most plausible of competing inferences" . . . Yet the inference of *scienter* must be more than merely "reasonable" or "permissible"--it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of *scienter* cogent and at least as

---

[41]Greebel v. FTP Software, Inc., 194 F.3d 185, 194 (1st Cir. 1999) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).

[42]N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 44 (1st Cir. 2008) (Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)).

[43]551 U.S. at p. 314.

[44]Id. at 322-23.

compelling as any opposing inference one could draw from the facts alleged.[45]

C.      Dismissal Is Appropriate Because Inter-Local Fails to Adequately Plead *Scienter*

Defendants' Motion to Dismiss presents three separate arguments for dismissal: (1) the Complaint fails to plead fraud with the requisite specificity; (2) any alleged material misstatements are protected under "safe harbor" provision of the PSLRA and the "bespeaks caution" doctrine; and (3) the Complaint fails to plead facts giving rise to a strong inference of *scienter*.  Since it is apparent that the Complaint is devoid of the particularized factual allegations concerning *scienter* required by the PSLRA, this memorandum need only address Defendants' third justification for dismissal.

Inter-Local argues that the Complaint, "[t]aken as a whole,"[46] sufficiently alleges that Defendants acted with actual knowledge or a high degree of recklessness.  To support this claim, Inter-Local relies on the following allegations, which it claims gives rise to a strong inference of *scienter*: (1) Defendant Berthiaume admitted knowledge of the falsity of statements regarding Japanese sales; (2) the Individual Defendants had actual knowledge, or were reckless in not knowing, of research suggesting an immediate decline in Japanese sales, as well as the effective tax rate for the fourth quarter; and (3) the Individual Defendants and seven other "insiders" sold 637,500 shares of Waters Corp. stock for over $42 million in proceeds during the Class Period. This court analyzes each of these allegations in accordance with the standard set forth in Tellabs.

1.      Defendants' Admissions

Inter-Local first argues that "Defendants admit that they knew there would be a softening

---

[45]Id. at 323-24.

[46]Pl.'s Opp. Mot. to Dismiss at p. 20.

17

in the Japanese market during the Class Period."[47]  After examining the evidence cited to support

this proposition, however, this court disagrees.

Paragraph 35 of the Complaint discusses the Year End Conference Call held in January

2008, which took place at least three months after the final alleged misstatement.  On the call,

Defendant Berthiaume explained that "sales in Japan were weaker than anticipated due to a

combination of a sluggish economic condition and a change in the testing protocols for drinking

water analysis in Japan."  He advised further that " the Japanese government substantially reduced

the sampling requirements and as a result we saw a reduction in our business."  For his part,

Defendant Ornell stated on the Year End Conference Call only that "[s]ales in Japan were softer

than expected."

Contrary to Inter-Local's claim, these statements establish nothing more than an

acknowledgment of a causal relationship between the change in Japanese testing protocols and a

decline in Japanese sales, and not, as Inter-Local alleges, an "admission" of actual knowledge of

the falsity of the July and October Statements at the time they were made.

Defendant Berthiaume did admit on that call, however, that he deserved to "take a little bit

of the blame" because "[w]e probably should have seen this a little earlier."  He also stated that

"[w]e knew that the slope wasn't going to be as strong forever in these applications, but the down

turn came much faster than we anticipated."  But these statements expressly <u>disclaim</u>, rather than

admit, actual knowledge.  To a certain extent, the statements acknowledge that strong Japanese

sales would not continue indefinitely.  But, they fall far short of establishing, as the Complaint

must, that Defendants "ha[d] sufficient information at the relevant time to form an evaluation that

---

[47]<u>Id.</u> (emphasis in original).

18

there was a need to disclose certain information and to form an intent not to disclose it."[48]  Since

no reasonable person could infer past knowledge from an acknowledgment of present conditions,

Inter-Local is not entitled to an inference of *scienter* arising out of this allegation.

      2.    <u>Research</u>

Inter-Local also claims that because the Japanese market represented 10% of Waters

Corp.'s net sales in 2006, "Plaintiff is entitled to the inference that Defendants would have been

kept updated about the changes in Japanese regulation."[49]  In the alternative, Inter-Local argues

that it is entitled to an inference that Defendants were "at the very least highly reckless in not

knowing about the March 2007 Japanese regulation change."[50]

Information concerning "what corporate managers knew and when they knew it" is

certainly "pertinent both to materiality and to *scienter*."[51]  On the subject of Defendants'

knowledge of research and other communications on a coming decline in Japanese sales, Inter-

Local alleges that: (1) during the Class Period the Individual Defendants, as directors and officers

the Company, were privy to material adverse non-public information concerning the business,

finances, products, markets and present and future business prospects of Waters Corp. "via

internal corporate documents, conversations and connections with other corporate officers and

---

[48]<u>N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.</u>, 537 F.3d 35, 45 (1st
Cir. 2008) (<u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512 F.3d 46, 62 (1st Cir. 2008)).

[49]Pl.'s Opp. Mot. to Dismiss at p. 21.

[50]<u>Id.</u>

[51]<u>Boston Sci. Corp.</u>, 523 F.3d at 86.

employees," etc.[52]; (2) the Japanese market, which represented more than 10% of Waters Corp.'s net sales in 2006, was an important market for the Company[53]; (3) Japanese regulatory authorities amended prevailing water testing regulations in March 2007 [54]; and (4) the Individual Defendants later acknowledged that this change in testing protocols led to a decline in Fourth Quarter profits.[55]

But, Tellabs requires this court conduct a comparative inquiry into the probative value of this information, to determine whether it satisfies the standard for *scienter* pleading established in the PSLRA.[56]  In this court's opinion, these vague, non-specific allegations give rise to only a very weak inference that the Individual Defendants, as responsible stewards of the Company, were aware that the March 2007 change in Japanese water testing protocols during the Class Period would materially effect fourth quarter sales.  Importantly, however, there are also several "plausible, nonculpable explanations" for Defendants' conduct.  For example, Defendants may not have understood at the time they were notified of the March 2007 regulatory changes that they would have a material impact on the Company's sales when the July and October Statements were made.  That explanation is bolstered by a statement made by Defendant Berthiaume on the January 2008 conference call that " [w]e probably should have seen this a little earlier."  At most, this statement creates an inference of ordinary negligence on Defendants' part, but falls far short

---

[52]Amd'd Compl. ¶ 9.

[53]Amd'd Compl. ¶ 21.

[54]Amd'd Compl. ¶ 22.

[55]Id. ¶ 35.

[56]Tellabs, Inc., 551 U.S. at 323.

20

of implying actual knowledge.

Similarly, the Complaint fails to provide sufficient facts to support the allegation that Defendants "were at the very least highly reckless in not knowing about the March 2007 Japanese regulation change."[57]   Inter-Local argues, in essence, that Defendants' failure to recognize and notify investors of the possible negative impact of these regulatory changes was tantamount to "an extreme departure from the standards of ordinary care."[58]   The Complaint, however, is devoid of additional factual allegations necessary to support that allegation.

Defendant also argues that, given the positions of the Individual Defendants in the Company, "it is a reasonable inference that they knew the tax rate would not come close to 15.9%," and, furthermore, "the short time between the 15.9% expectation and the 20.7% disclosure supports a strong inference of *scienter*."[59]   But a comparison to the caselaw cited by Inter-Local on this point in its own brief suggests that this case is <u>not</u>, in fact, one where such circumstances strongly indicate *scienter*.

For example, in <u>Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.</u>,[60] the First Circuit found that a securities fraud plaintiff adequately alleged *scienter* where the defendant's chief operating officer stated that the problem with defendant's product had been "fixed" only one week prior to its recall.   In that case, the complaint contained a host of particularized factual

---

[57]Pl.'s Opp. Mot. to Dismiss at p. 21.

[58]<u>Greebel</u>, 194 F.3d at 198 (quoting <u>Sundstrand Corp. v. Sun Chem. Corp.</u>, 553 F.2d 1033, 1045 (7th Cir. 1977)).

[59]Pl.'s Opp. Mot. to Dismiss at p. 26.

[60]523 F.3d 75 (1st Cir. 2008).

allegations indicating that the defendant, a medical device manufacturer in a highly regulated industry, knowingly withheld information concerning a problem with its coronary stent.  The <u>Boston Sci. Corp.</u> complaint plead the following particularized facts establishing *scienter*: (1) a <u>Boston Sci. Corp.</u> SEC Form 10-Q reported a voluntary recall of the device; (2) there were several statements made by the company regarding "investigations" relating to an expanded recall; and (3) there were adverse reports from doctors in the United States and Europe regarding the safety of the device.[61]

In contrast, the time period between the alleged misleading statements or omissions and eventual disclosure in this case—four months—does not give rise to an inference of knowledge or recklessness given the notable absence of other allegations suggesting that Defendants knowingly concealed materially adverse information.  Indeed, in stark contrast to <u>Boston Sci. Corp.</u>, Inter-Local relies almost exclusively on a single statement on the Year End Conference Call that Mr. Berthiaume "asked three times" about the accuracy of the predicted tax rate.  Absent further allegations, it would be more reasonable for a jury to infer that the tax rate prediction was simply incorrect.  But, since the <u>Tellabs</u> court advised that it "does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind," this allegation is insufficient under PSLRA.[62]

3.    <u>Insider Trading</u>

In pleading *scienter*, Inter-Local relies heavily on allegations of insider trading at Waters Corp., claiming that "Defendants and other insiders were able to hide the information they knew

---

[61]<u>Id</u> at 86-93.

[62]<u>Tellabs, Inc.</u>, 551 U.S. at 314.

about the Japanese market long enough to sell 637,500 shares of the Company for over $42

million in proceeds."[63]

It is well-established that allegations of insider trading are not by themselves sufficient to

plead *scienter*, but may prove adequate when considered in combination with other factual

allegations establishing context.[64]  Indeed, "[t]he vitality of the inference to be drawn [from

allegations of insider trading] depends on the facts, and can range from marginal . . . to strong."[65]

At a minimum, to survive a motion to dismiss, allegations of insider trading must be coupled with

an allegation that the defendants had incentives to withhold certain information, as well as an

allegation that the trading activity is "unusual, well beyond the normal patterns of trading by those

defendants."[66]  Measured against this backdrop, the Complaint does not contain allegations

sufficient to withstand dismissal.

The Complaint identifies nine alleged "insiders" accused of selling stock during the Class

Period.  Of those nine individuals, Inter-Local alleges that only two of them, Defendants

Berthiaume and Ornell, are responsible for making the alleged misstatements to investors.  The

Complaint is devoid of <u>any</u> information on the other seven individuals, aside from their inclusion

in a chart listing their stock sales, and does not specifically reference any of these individuals in

the context of material misstatements made by the Company to its investors.  For that reason, this

court will assess only allegations relating to stock sales by Defendants Berthiaume and Ornell, and

---

[63]Pl.'s Opp. Mot. to Dismiss at p. 21.

[64]<u>Boston Sci. Corp.</u>, 523 F.3d at 92.

[65]<u>Greebel</u>, 194 F.3d at 197-98.

[66]<u>Id.</u> at 198.

disregard Inter-Local's allegations regarding the other seven alleged insiders.

Inter-Local first alleges that Berthiaume sold 180,000 shares on September 11, 2007, during the Class Period.  When viewed in context, however, the size, timing and circumstances of these sales do not suggest that something "unusual" was afoot.  Significantly, for example, Inter-Local alleges that Defendant Berthiaume sold his stock at $63.78 and $63.28 per share, only a modest gain in light of the fact that Inter-Local filed this suit after the Company's stock fell to a low of $58.58 per share from a high of $80.77 per share.  In addition, Berthiaume allegedly sold only 6.08% of his total stock holdings, excluding options, which are discussed in further detail below, during the Class Period.  Taken together, therefore, these allegations give rise to only a very weak inference of *scienter*.

This court found it more difficult to weigh allegations concerning stock sales by Defendant Ornell.  Inter-Local alleges that Ornell sold 20,000 shares of stock on September 12, 2007 for $63.49, and an additional 60,000 shares on October 26, 2007 at $75.95, $75.53, and $76.09 per share, unloading over 83.24% of his total holdings of Waters Corp. stock during the Class Period.  Viewing Inter-Local's allegations in isolation, Defendant Ornell's stock sales could give rise to a cogent inference of *scienter* on his part: the majority of his stock sales were made near the stock's high of $80.77; he allegedly sold a significant percentage of holdings; and a substantial portion of his sales occurred only three days after a conference call on which he allegedly made certain misstatements.

After reviewing SEC filings referencing Mr. Ornell's stock sales attached to Defendants' Motion, however, it is clear, in this court's opinion, that Inter-Local dramatically inflated the percentage of Mr. Ornell's total holdings unloaded during the Class Period.  Defendants point out

that Mr. Ornell obtained the stock sold during the Class Period through a contemporaneous exercise of options rather than, as Inter-Local suggests, simply selling stock he owned outright. Taking into account Mr. Ornell's total holdings including options (excluding options not yet exercisable), he actually only sold 7.06% of his holdings on September 12, 2007 and approximately 21.65% of his holdings on October 26, 2007.

Inter-Local counters that "Boston Scientific [] and Biogen IDEC [] is the controlling law in this Circuit, and neither requires the inclusion of Defendants' options in their percentage of holdings in order for the stock sales to support a strong inference of *scienter*."[67]  It is not apparent, however, that prevailing caselaw in the First Circuit does not require that this court consider Ornell's options holdings.  To the contrary, this court thinks that it would be remiss to disregard Defendants' options holdings given that, in determining the quality of any inference arising from allegations of *scienter*, the court is tasked with conducting the inquiry with a broad lens, considering all facts helpful in determining the "vitality" of that inference.[68]  In doing so, this court finds that Mr. Ornell's retention of over 70% of his total holdings greatly diminishes any inference of fraudulent intent.

In addition, even if Inter-Local's allegations against Mr. Ornell adequately allege *scienter*, which they do not, allegations regarding trading activity based solely on Mr. Ornell's stock sales cannot give rise to an inference of *scienter* against the other Defendants in this case, Waters Corp.

---

[67]Pl.'s Opp. Mot. to Dismiss at p. 23.

[68]See Boston Sci. Corp., 523 F.3d at 92.

or Mr. Berthiaume.[69]

Having reviewed Inter-Local's allegations regarding Defendants' alleged "admissions," the Individual Defendants' attention or inattention to research on the Company's Japanese sales prospects and expected tax rates, and insider trading, this court finds that no reasonable person could find any inference of *scienter* arising from these allegations to be "cogent and compelling," as Tellabs requires.  Accordingly, Inter-Local's claim under §10(b) must be dismissed.

    D.    Section 20(a)

Inter-Local also asserts a cause of action against the Individual Defendants under Section 20(a) of the Exchange Act.  Because this court has found that Inter-Local has not adequately alleged an underlying § 10(b) violation, the § 20(a) "controlling person" claim must therefore also be dismissed.[70]

    IV.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is ALLOWED.  This case is DISMISSED.

    AN ORDER HAS ISSUED.


                            ___/s/ Joseph L. Tauro_____
                            United States District Judge

_____

[69] See N.J. Carpenters Pension & Annuity Funds., 537 F.3d at 56 ("'even unusual sales by one insider do not give rise to a strong inference of *scienter*' when other insiders had not engaged in suspicious trading during the class period") (quoting Abrams v. Baker Hughes Inc., 292 F.3d 424, 435 (5th Cir. 2002)).

[70] See id. at 64; ACA Fin., 512 F.3d at 67–68 ("The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation.").